In the Matter of the Rehabilitation of the EMPIRE MUTUAL INSURANCE COMPANY, Respondent. ARMANDO BARONE, Appellant.

First Department, March 9, 1982

**APPEARANCES OF COUNSEL**

*Philip Hoffer* of counsel (*Rose L. Hoffer* with him on the brief; *Raymond J. MacDonnell,* attorney), for respondent.

*Ira Leitel* and *David Jaroslawicz* for appellant.

**OPINION OF THE COURT**

SULLIVAN, J.

Claimant Armando Barone appeals from an order confirming the referee's report and denying and dismissing his first-party benefits claim against Empire Mutual Insurance Company, which is in rehabilitation pursuant to article 16 of the Insurance Law.

The facts are not in dispute. Mr. Barone, an independent contractor making a masonry repair, was injured on April 10, 1978 on the premises of Elan's Service Station when he was struck by a vehicle owned by Nick Hambas. The Hambas vehicle, which had been delivered to the station the night before for repairs, was being operated at the time

of the accident by an Elan's employee who "was moving the car * * * to begin doing work."

Mr. Hambas' automobile was covered by an Empire Mutual automobile liability policy which complied with the requirements of article 6 of the Vehicle and Traffic Law and included the Mandatory Personal Injury Protection Endorsement [no-fault insurance] required by subdivision 1 of section 672 of the Insurance Law. Mr. Barone made a claim for first-party benefits under the Empire policy. The Superintendent of Insurance, as rehabilitator, invoking a provision of the no-fault endorsement excluding loss arising out of "conduct within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles", disallowed the claim. We agree that the claim should be excluded and affirm Special Term's determination.

The pertinent provisions of Empire's no-fault endorsement are as follows:

*"Mandatory Personal Injury Protection*

"The Company will pay first party benefits to reimburse for basic economic loss sustained by an eligible injured person on account of personal injuries caused by an accident arising out of the use or operation of a motor vehicle."

*"Other Definitions * * ***

"(h) 'use or operation' of a motor vehicle includes the loading or unloading of such vehicle but does not include conduct within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles, unless the conduct occurs off the business premises."

This definition of "use or operation" follows verbatim the definition of "use or operation" contained in the Insurance Department's duly promulgated Mandatory Personal Injury Protection Endorsement, which has been in effect since the inception of no-fault insurance in this State on February 1, 1974. The mandatory endorsement for accidents occurring on or after December 1, 1977 is found in a regulation published in 11 NYCRR 65.12 (a).[1] Except for

---

1. This definition of "use or operation" first appeared in the Mandatory Personal Injury Protection Endorsement promulgated by regulation, duly adopted October 3, 1973 and published in 11 NYCRR 65.2 (a) ("Other Definitions", subd [h]), which endorsement and regulation now apply only to personal injuries sustained before December 1, 1977.

an Insurance Department examiner's interpretation of the "use or operation" exclusion, which interpretation is at odds with the position taken by the Superintendent of Insurance, as rehabilitator, in this proceeding, we do not have the benefit of any statement of regulatory purpose in the promulgation of the exclusion.

We find the endorsement's definition of "use or operation" to be clear and unambiguous on its face in its exclusion of loss arising out of on-premises accidents which occur in the course of the business of repairing, servicing or otherwise maintaining motor vehicles. Unlike the dissent, we do not read the clause "but does not include conduct within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles" as a qualification of "loading or unloading", but rather, as a clear limitation of "use or operation." Where the words of a statute are free from ambiguity and their meaning unequivocal, courts are not at liberty to construe. (*People ex rel. New York Cent. & Hudson Riv. R. R. Co. v Woodbury,* 208 NY 421; *People ex rel. Lehigh & N. Y. R. R. Co. v Sohmer,* 217 NY 443, mot for rearg den 218 NY 632; *Mount v Mitchell,* 31 NY 356, mot for rearg den 32 NY 702; McKinney's Cons Laws of NY, Book 1, Statutes, § 76.)

The dissent urges that the clause was designed to limit "loading and unloading" so as to exclude activities usually associated with the repair and maintenance of vehicles and which might otherwise be viewed as "loading or unloading." If that were the superintendent's intent, however, the limitation ought to apply off-premises as well as on-premises. On the other hand, since the operative word in both the on-premises exclusion and off-premises inclusion is "conduct", we find it clear that the exclusion turns, not on the nature of the repairman's activity, but rather, on the place where that activity occurs. Viewed in that light and giving the word "conduct" its plain meaning, the reason for the distinction between on-premises and off-premises incidents becomes apparent — off-premises conduct, including the operation of a motor vehicle by a service station em-

The mandatory endorsement promulgated in 11 NYCRR 65.12 (a) ("Other Definitions", subd [h]) was adopted on November 28, 1977 and applies to personal injuries sustained on or after December 1, 1977. The new regulation was made necessary in order to comply with the 1977 amendments to the statute. (L 1977, ch 892, § 6 *et seq.*)

ployee to whom the vehicle has been entrusted for repair, is a peril normally associated with the use or operation of an automobile, and thus in the event of loss, reparation ought to be paid, irrespective of fault. The same conduct occurring on-premises constitutes a hazard which is peculiarly within the operations of a repair or service station business[2] and should be excluded from the scope of motor vehicle "use or operation" under no-fault insurance. The loss from the latter conduct should come out of the pocket of the repairman who is charging for the service, not out of the insured's no-fault premiums. While a primary purpose of the no-fault legislation was to provide for the swift payment of benefits to injured parties, irrespective of fault, it was also designed to provide "substantial premium savings to all New York motorists." (Governor's Memorandum, NY Legis Ann, 1973, p 298.)

The exclusion has an analogue in the standard automobile liability policy's omnibus clause, which extends coverage to, *inter alia,* any other person using the motor vehicle with the insured's permission, but has historically excluded the service station, public garage, sales agency, repair shop, or public parking place, even though such an establishment has rightful custody of the vehicle during its operation, maintenance, or use by an employee thereof. (6C Appleman, Insurance Law and Practice [Buckley ed], § 4372.) In New York, the regulatory authorization for the garage or service station exclusion is found in 11 NYCRR 60.1 (c) (3) (i), which provides that "the policy need not apply * * * to any person or organization, or to any agent or employee thereof, employed or otherwise engaged in operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any accident arising out of the maintenance or use of a motor vehicle in connection therewith".

Although the automobile policy does not insure the liability of the service station owner or his employee, it does, of course, by statute in New York, cover the vicarious

---

2. Mr. Barone has recovered $150,000 in a settlement of his negligence action against Elan's.

liability of the insured for their negligence, whether on or off the premises, and irrespective of whether that liability is based on either permissive use (Vehicle and Traffic Law, § 388)[3] or, through the application of traditional tort concepts, i.e., *respondeat superior*. The exclusion is not, however, without practical efficacy. Since neither the service station owner nor his employee is an insured under the policy, and is indeed excluded from coverage, an insurer defending a negligence action against its insured premised upon vicarious liability for an on-premises accident involving personal injuries arising out of the business of operating an automobile service station could cross-claim against or implead, as the case may be, the service station owner and his employee for indemnification or contribution, thereby placing all or part of the ultimate loss where it properly belongs. The exclusion thus serves to minimize the insurer's exposure to the high-risk peril of service station operations. Without the "use or operation" exclusion for on-premises activities, the no-fault insurer, in cases where the service station owner or his employee is not at fault, would have no right of recourse.[4]

Moreover, and more significantly, evidence that the exclusion dealing with on-premises "conduct within the course of a business of repairing [or] servicing * * * motor vehicles" was intended by the superintendent to qualify "use or operation" and not merely, as the dissent contends, "loading or unloading", so as to exclude nonoperational activities such as repairs, may be gleaned by reference to the origins of the phrase "use or operation". Section 52 of the Vehicle and Traffic Law, now section 253, which provides for service of process on a nonresident in an action

---

3. Before the enactment of section 388 in 1958 (L 1958, ch 577), the vicarious liability concept applied only to the use and operation of a motor vehicle "upon a public highway" and did not extend to "the situation of an accident upon private roadways and parking lots." (*Farber v Smolack,* 20 NY2d 198, 204; see 1958 Report of NY Law Rev Comm [NY Legis Doc 1958, No. 65], pp 589-590.)

4. In an action by a covered person against a noncovered person for personal injuries arising out of the use or operation of a motor vehicle, "an insurer which paid or is liable for first party benefits * * * shall have a lien against any recovery to the extent of benefits paid or payable by it to the covered person." The failure of a covered person to commence such an action within two years of accrual operates to give the insurer a cause of action for the amount of first-party benefits paid or payable against the party who may be liable to the covered person. (Insurance Law, § 673, subd 2.)

arising out of the use or operation of a motor vehicle in this State, was amended in 1958 to insert "use or operation", where formerly only "operation" had been used. (See L 1958, ch 568.) This expansion was in response to a Law Revision Commission study regarding questions which had arisen "as to whether various acts done with or to the vehicle when it is not actually in motion, such as unloading or making repairs, will provide a basis for an action within the statute [since in instances] * * * where the injuries were sustained while the vehicle was being unloaded, the courts have held that the action does not grow out of an accident involving the operation of the vehicle." (1958 Report of NY Law Revision Comm, p 648, citing cases; see *Aranzullo v Collins Packing Co.,* 18 AD2d 1068, affd 14 NY2d 578; also New York Adopts No-Fault: A Summary and Analysis, 37 Albany L Rev 662, 675.) The insertion of the word "use" was intended to assure that nonoperational activities, such as repairs or the loading of a vehicle, were to be included within the scope of the statute. Thus, the word "operation" has historically had a meaning separate and distinct from "use". Inasmuch as the mandatory endorsement's limitation of "use or operation" by the clause "but does not include conduct within the course of a business of repairing [or] servicing motor vehicles" is not confined to "use", we can only conclude that the limitation was intended not just for activities usually associated with the repair and maintenance of vehicles and of a kind that might be viewed as "loading or unloading", but for operational conduct as well.[5]

We find it difficult to accept the premise that the superintendent, had he intended to exclude only on-premises nonoperational activities such as repairs, could not have written a regulation which would have clearly accomplished that objective. In this connection, we note that the Superintendent of Insurance has, in another context, fash-

---

5. The argument that the "use or operation" limitation excluding on-premises conduct within the course of a business of a service station was not intended to include on-premises operation of a motor vehicle was never made to the referee or at Special Term. Before the referee claimant argued that the accident did not occur during the course of repair, while his contention at Special Term in opposition to the motion to confirm the referee's report was that the exclusion applied only to the owner or employee of a service station, and he was neither.

ioned an articulate and cogent regulation authorizing a limitation of "loading or unloading" which could have been adapted for use here had that been his intent: "As respects any person or organization other than the named insured or such spouse" an automobile liability insurance policy "need not apply * * * to any person or organization, or to any agent or employee thereof, with respect to bodily injury, sickness, disease or death, or injury to or destruction of property arising out of the loading or unloading of the motor vehicle." (11 NYCRR 60.1 [c] [3] [iii].)

The major thrust of the dissent's argument is that the literal interpretation of the "use or operation" definition excluding coverage for "conduct within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles" is at odds with the spirit and intent of New York's no-fault statute, which requires that automobile liability policies issued in compliance with the requirements of article 6 or 8 of the Vehicle and Traffic Law provide for the payment to those eligible of "first party benefits * * * for loss arising out of the use or operation in this state of [a] motor vehicle" (Insurance Law, § 672, subd 1, par [a]). That the Insurance Department's definition of "use or operation" excludes the claim of a "covered person"[6] for a certain type of accident makes the regulation no less a valid exercise of administrative power in the absence of a showing that the promulgation of the regulation is *ultra vires*. (See *Matter of Picone v Commissioner of Licenses of City of N. Y.*, 241 NY 157.) The legitimacy of the regulation turns not on a perception of whether it serves the purpose of the statute, but whether the Legislature gave the superintendent authority to exclude certain types of service station accidents from first-party coverage. In this connection we note that the Third Department has enforced the "use or operation" exclusion for injuries sustained during the course of an on-premises motor vehicle repair. (*Sando v Firemen's Ins. Co. of Newark, N. J.*, 79 AD2d 774.)

6. In this instance, a "pedestrian injured through the use or operation of * * * a motor vehicle which has in effect the financial security required by [article 6] of the [V]ehicle and [T]raffic [L]aw". (Insurance Law, § 671, subd 10.)

Thus, the question essential to the disposition of this appeal is whether the superintendent is empowered to exclude on-premises accidents arising out of the use or operation of a motor vehicle in the course of a motor vehicle repair business from first-party benefits coverage. It should be noted that the exclusion is not geographical; the service station premises, itself, is not an excluded area. Moreover, the exclusion does not except from coverage any special class of injured party. In this case, had the Hambas vehicle been driven at the time of the accident by anyone other than an employee of Elan's or someone similarly engaged, Barone would have been entitled to first-party benefits, notwithstanding that the accident occurred on the service station premises or that he was performing a service for the repair station owner. Thus, the exclusion is reasonable and truly a limitation of "use or operation". In interpreting the no-fault statute the superintendent has been given broad power to prescribe regulations "not inconsistent with [its] provisions". (Insurance Law, § 21.) In promulgating the "use or operation" exclusion at issue, he has neither acted in derogation of the statute nor arrogated powers to himself.

The thesis that the exclusion can be rationalized by finding that its purpose was to exclude only on-premises activities involving the repair of a vehicle when it is not in operation is inconsistent with the argument that the superintendent lacks statutory authority to exclude a service station accident occurring when a car is in operation, because the exclusion authorization for either limitation cannot be found in the statute. If the superintendent does not have the power to exclude from coverage "operation" of a vehicle while it is in a service station, he also does not have the power to exclude "use" (which includes repair[7] — cf. *Blake v Salmonson,* 188 Misc 97) of a vehicle while it is on the same premises.

Nor do we believe that *Servido v Superintendent of Ins.* (53 NY2d 1041, revg on dissenting opn 77 AD2d 70, 76-86)

---

7. As this record discloses, an arbitrator hearing a first-party benefit claim has concluded that an on-premises scalding injury which occurred when an attendant

compels a departure from the literal interpretation of the "use or operation" definition excluding on-premises accidents arising out of the use or operation of a motor vehicle within the course of the business of repairing or servicing motor vehicles. In *Servido* the superintendent, by regulation, had authorized a provision excluding from coverage a class, viz., members of an insured's household otherwise covered for loss arising out of the use or operation of an uninsured motor vehicle, because the household member owned the uninsured vehicle. The regulation was held to be invalid because the Legislature had not authorized the exclusion, since it had specifically enumerated, without mentioning this class, those classes which could be excluded. As already noted, no class has been excluded here.

Finally, the opinion of the Senior Examiner of the Insurance Department, as expressed in similar cases, that the clause "conduct within the course of a business" refers to the status of the injured party, does not withstand analysis. In the examiner's view the "use or operation" definition was intended to exclude from first-party benefits service station employees, not innocent bystanders, such as pedestrians and customers, who are injured through the use or operation of a motor vehicle while that vehicle is being serviced. "[T]he insurance coverage in this statute is designed to follow the vehicle rather than the injured party". (*Ohio Cas. Ins. Co. v Continental Ins. Co.*, 101 Misc 2d 452, 455.) Furthermore, it has been held that the availability of workers' compensation benefits is not a bar to a claim for first-party benefits. (*Ryder Truck Lines v Maiorano*, 44 NY2d 364; see, also, *Carriers Ins. Co. v Burakowski*, 93 Misc 2d 100, 102.) Moreover, this interpretation makes little practical sense since, by statute, first-party benefits entitlement is discounted by and to the extent of recovered or recoverable workers' compensation or disability benefits. (See Insurance Law, § 671, subd 2, par [b].) Nor, if the exclusion were intended to exclude a class, i.e., service station employees, does the examiner's interpretation justify the distinction between on-premises and off-premises accidents.

---

removed the radiator cap from an overheated inert automobile is a loss arising from the "use or operation" of a motor vehicle.

Accordingly, the order of the Supreme Court, New York County (ASCH, J.), entered March 28, 1980, should be affirmed, without costs or disbursements.

SANDLER, J. (dissenting). On April 10, 1978, the claimant Armando Barone sustained injuries on the premises of Elan's Service Station, Inc. (Elan), when he was struck by a vehicle driven by Eliahou Haim, president of the corporation that owned the station. Mr. Barone, not a regular employee of the service station, was patching a hole on the premises of the station at Mr. Haim's request when Haim entered an automobile, which was awaiting repairs, drove it toward the repair bays, accidentally hit Mr. Barone and injured him.

A referee disallowed Mr. Barone's claim for first-party (no-fault) benefits for basic economic loss from Empire Mutual Insurance Co. (Empire), insurer of the automobile. Special Term confirmed the referee's report. I disagree and would reverse Special Term's order to the extent of disaffirming the referee's report, sustaining claimant's right to no-fault benefits, and remanding for further proceedings.

Section 672 (subd 1, par [a]) of the Insurance Law provides in pertinent part for payment of first-party benefits to any person "for loss arising out of the use or operation in this state" of a motor vehicle insured in satisfaction of the requirements of article 6 or 8 of the Vehicle and Traffic Law. The vehicle in question was so insured. The dispositive question is whether claimant's injuries were sustained through the "use or operation" of the car that struck him. "[U]se or operation" is not defined in the statute. In a regulation promulgated by the Superintendent of Insurance on October 3, 1973, 11 NYCRR 65.2 (a) ("Other Definitions", [h]), the term was defined as follows: "(h) 'use or operation' of a motor vehicle includes the loading or unloading of such vehicle but does not include conduct within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles, unless the conduct occurs off the business premises."

In disallowing the claim for any no-fault benefits, Special Term gave a literally correct application to the immediately relevant words of the regulation. But if the literal

interpretation is the correct one as applied to the present facts, it is immediately apparent that as so applied the regulation is unauthorized and invalid. The broad power of the superintendent under section 21 of the Insurance Law to issue regulations "not inconsistent with the provisions of this chapter" does not authorize the superintendent to define critical statutory words in a manner wholly contrary to their obvious and usual meaning with the result of excluding from coverage claims clearly authorized by the plain meaning of the statutory language and wholly consistent with the statutory purposes.

However, it is unnecessary here to find the regulation invalid as applied to the instant facts because there are available alternative constructions of the regulation which, though not entirely satisfactory as a matter of textual analysis, have the decisive merit of reconciling in a plausible way the regulation with the plain meaning of the dispositive sections of the statute.

In the opening sentence of the regulation which defines "use or operation" of a motor vehicle to include "loading or unloading", the Superintendent of Insurance undertook to resolve an issue that would otherwise have been open to varying interpretations, and did so in accordance with a previous body of case law construing coverage under insurance policies. (See *Continental Ins. Cos. v Transport Ins. Co. of Transport Group,* 52 AD2d 210; *Cosmopolitan Mut. Ins. Co. v Baltimore & Ohio R.R. Co.,* 18 AD2d 460.) A different issue is presented by a proposed construction of the following clause that would exclude from the meaning of the word "operation" a vehicle actually being driven. A driven car is in "operation". That is its normal, accepted meaning. If, as seems doubtful, the regulation was intended to give a meaning to the word "operation" wholly at variance with its universally accepted understanding, it would represent an unauthorized and improper exercise of the superintendent's power to issue rules and regulations in furtherance of the statute and to that extent would be invalid. (See *Servido v Superintendent of Ins.,* 53 NY2d 1041; *Matter of Adams* [*Government Employees Ins. Co.*], 52 AD2d 118, 121.)

Nor could the regulation as so interpreted and applied be sustained as an appropriate method for the superintendent to set forth a broadly limiting interpretation on the scope of no-fault coverage under the statute. There is simply no basis in the statute for exempting from no-fault coverage a pedestrian injured by a driven vehicle on service station premises. As already noted, section 672 (subd 1, par [a]) of the Insurance Law provides for payment of first-party benefits to any person "for loss arising out of the use or operation in this state" of a motor vehicle insured as was the vehicle here. The section does not go on to qualify the broad sweep of the quoted language to exclude from coverage losses occurring "within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles". Subdivision 2 of section 672 of the Insurance Law explicitly identifies those whom "[a]n insurer may exclude from coverage required by subdivision one". No authority is there presented for the exclusion urged here.

In an effort to find a plausible basis for the construction adopted at Special Term, Empire has argued that the regulation was in some way influenced by a body of decisions which, with some exceptions, gave effect to a provision in automobile liability insurance policies that excluded from coverage service stations, public garages, and the like. The argument is unpersuasive. The essential holding of these cases was that automobile liability insurers by an appropriate limitation could avoid responsibility for judgments rendered against the varied types of facilities described above. Neither the clause referred to, nor the cases interpreting it, limited the liability of the insured car owner for injuries sustained when the owned vehicle was driven by a service station or garage employee, and in no way limited the liability of the insurer in the event of a judgment against its insured. (See 6C Appleman, Insurance Law and Practice [Buckley ed], § 4372.) In the absence of any specific indication that the regulation was in some way influenced by this body of authority, Empire's claim of a relationship appears extremely tenuous.

Indeed, a compelling argument directly to the contrary appears when section 672 (subd 1, par [a]) of the Insurance Law is compared with section 388 of the Vehicle and

Traffic Law. Subdivision 1 of section 388 of the Vehicle and Traffic Law provides in pertinent part: "Every owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner".

In *Farber v Smolack* (20 NY2d 198, 204) the Court of Appeals explained the reason for the addition of the words "in this state" in 1958 to the predecessor section of section 388 (subd 1): "It was substituting 'in this state' for the former words 'upon a public highway' in order to cover the situation of an accident on private roadways and parking lots (1958 Report of N. Y. Law Rev. Comm. [N. Y. Legis. Doc., 1958, No. 65], pp. 589-590)."

It is not easy to believe that the Legislature intended to authorize the Superintendent of Insurance to interpret section 672 (subd 1, par [a]) to reintroduce into the law of this State in a broadly remedial statute substantially the same limitation that had been definitively eliminated years earlier.

The construction accepted by Special Term creates a perplexing gap in no-fault coverage, without any discernible support in the statute, its purposes, or prior authority, and inexplicably relegates someone in the claimant's position to a traditional negligence action against the service station, the owner of the vehicle, or both. It is not surprising that advisory opinions of the Department of Insurance have explicitly rejected a construction of the regulation that excludes someone in the claimant's position from no-fault coverage.

In short, the regulation is not correctly interpreted to exclude from no-fault coverage a pedestrian injured by a vehicle in the course of being driven in the business of a service station, or the like. If the regulation in fact had that meaning, it would represent an unacceptable departure from the plain meaning of the statutory language that it purported to define and thus would be unauthorized and invalid. (See *Servido v Superintendent of Ins., supra; Matter of Adams [Government Employees Ins. Co.], supra.*)

When the regulation is examined with an awareness that it was not intended, and could not have been intended, to define "use or operation" in a manner wholly inconsistent with the accepted meaning of these words, alternative constructions of the regulation, more consistent with the statutory language and its purposes, become apparent. In this light it seems likely that the pivotal provision in the regulation was the definition of "use or operation" to include "loading or unloading". The following clause, the one with which we are concerned, is preceded by the word "but", and thus appears to be a limited qualification to the broad interpretation of "use and operation" previously set forth.

Thus one possible interpretation of the critical language is that it represented an effort to make clear that the definition of "use or operation" first set forth was not to be interpreted as sweeping within the scope of no-fault coverage activities on business premises associated with the repair and maintenance of vehicles of a kind that might otherwise be viewed as "loading or unloading" or sufficiently analogous to come within the scope of the earlier definition.

A somewhat different interpretation is advanced in the department's advisory opinions which state that the pertinent clause of the regulation was designed to exclude from no-fault coverage employees injured while engaged in the business of repairing and servicing motor vehicles on the business premises. Undeniably this purpose was not conveyed in the regulation as clearly as it should have been, and one may readily foresee situations in which there might appear a conflict between the apparent meaning of the regulation and the department's own interpretation. At a minimum, however, the advisory opinions of the department confirm that under the circumstances disclosed in this case the claimant was entitled to recovery of no-fault payments. Although presented without a detailed analysis of the language, it may well be that the statement of the regulation's purpose presented in the department's advisory opinions rests upon an analysis of the regulation similar to that set forth above.

Although a thoughtful contribution to an understanding of the problem presented, the majority opinion seems to me ultimately to fail in its efforts to provide a satisfactory basis for the anomalous result reached. As construed by the majority, and found by them to be a reasonable exercise of the superintendent's regulatory power, the regulation mandates a manifestly unfair result in which no-fault benefits are available to anyone struck by a moving vehicle anywhere in this State with the single exception that recovery is denied if the person is struck on business premises by a vehicle being used or operated "within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles".

The majority opinion reasons that the superintendent, concerned with the level of premiums, concluded that as between the no-fault insurer and the garage or repair shop insurer, the burden of payment should fall on the latter. As applied to the situation presented here, this explanation is unpersuasive.

Preliminarily the event with which we are concerned, a nonemployee on business premises struck by a vehicle being driven in the course of the business, is surely an unusual one, most unlikely to have a statistically significant impact on insurance rates. Moreover, subdivision 2 of section 673 of the Insurance Law carefully protects the right of the no-fault insurer to indemnification for basic economic loss payments in the event that the insured person recovers a judgment in a negligence action. The impact of the regulation as construed by the majority opinion, and found by them to be reasonable, occurs precisely when the injured person does not or cannot recover in a negligence action. This will most often occur either where the injured person is unable to establish culpability or where the anticipated recovery is not sufficient to justify the expenses and problems of litigation. In short, the regulation as construed by the majority will require the injured person, if he is to recover for his loss, to undertake precisely the kind of negligence action which the no-fault statute was specifically designed to eliminate.

No doubt such actions may from time to time result in the ultimate payment by the business insurer of the equiv-

alent of basic economic loss that would otherwise have been expeditiously paid by the no-fault insurer. Even in those situations the recovery will impose on the injured person litigation expenses and delay in recovery that the statute was intended to avoid. Indeed such actions will inevitably entail additional litigation expenses for no-fault insurers as well. But surely the most unfortunate result will be that the injured person will be unable to recover for any part of his losses either because he is unable to establish fault or because the limited character of his losses will not justify the expenses and uncertainties of litigation. The injured person, not either of the insurers, will bear the loss. This seems to me so clearly wrong, so totally discordant with the wording and purpose of the no-fault statute, that the regulation if interpreted to require such a result, must be considered unreasonable.

In the light of this discussion, it may be possible to state more precisely the purpose and intended scope of the regulation. The superintendent reasonably recognized that the overwhelming majority of injuries incurred on-premises in the course of the described business, those involving injuries to employees covered by workers' compensation while engaged in the actual repair of stationary vehicles, do not properly fall within the scope of no-fault coverage. Arguably, although less clearly, the same judgment might be made with regard to injuries sustained by business employees struck by vehicles being driven in the course of the business. Also arguably, although to me less likely, the same evaluation might be made with regard to injuries sustained by nonemployee visitors as a result of action by employees engaged in the actual repair of stationary vehicles. What seems to me inconceivable is that the superintendent intended to exclude from no-fault coverage nonemployees injured as a result of being struck by a moving vehicle on business premises. It may be that language was improvidently used in the regulation that inexorably requires the interpretation reached by the majority, although I am not convinced that this is so for reasons stated earlier. If so, as applied to the present circumstances, the regulation departs so radically from the statutory lan-

guage and produces a result so manifestly unjust, that it should, to that extent, be found unauthorized and invalid.

The final issue is presented by the claimant's settlement for $150,000, while this appeal is pending, of an action brought by him against Elan's Service Station. At the time the action was settled, Special Term had ruled that claimant was not entitled to receive first-party benefits. Accordingly, from the limited information available, it appears possible that the settlement may well have embraced damages for basic economic loss.

Empire contends that the settlement independently precludes claimant's right to recover no-fault benefits since it allegedly impaired Empire's lien rights under subdivision 2 of section 673 of the Insurance Law. That section provides in pertinent part: "In any action by or on behalf of a covered person, against a noncovered person * * * an insurer which paid or is liable for first party benefits on account of such injuries shall have a lien against any recovery to the extent of benefits paid or payable by it to the covered person."

It is unnecessary to resolve the preliminary question as to whether or not Elan was a "noncovered person" within the meaning of the section. Since it seems likely that Elan was sued on the basis that it was a noncovered person and the lawsuit was settled on that understanding, the section should be deemed applicable.

Subdivision 2 of section 673 of the Insurance Law goes on to provide: "No such action may be compromised by the covered person except with the written consent of the insurer, or with the approval of the court, or where the amount of such settlement exceeds fifty thousand dollars." The record is clear that the court approved the settlement, and that the settlement exceeded $50,000. Therefore, there appears no basis whatever for Empire's contention that the settlement bars the claim for no-fault benefits. It may be noted that the problem would not have arisen except for the fact that Empire had resisted successfully the claim for no-fault benefits. Since the record does not disclose what portion, if any, of the $150,000 settlement represented recovery for basic economic loss, a hearing on the issue is

required to determine whatever rights Empire may have to a setoff. (See *United States Fid. & Guar. Co. v Stuyvesant Ins. Co.*, 61 AD2d 1122.)

The order of the Supreme Court, New York County (ASCH, J.), entered May 28, 1980, affirming the report of the referee denying and dismissing the claim against the insurer, should be reversed, on the law, the motion to confirm should be denied, the claimant's right to no-fault coverage payments should be sustained, and the matter should be remanded for a hearing to determine whether any portion of the settlement was attributable to economic loss and, if so, what portion was so attributable.

KUPFERMAN, J. P., and CARRO, J., concur with SULLIVAN, J.; SANDLER and ROSS, JJ., dissent in an opinion by SANDLER, J.

Order, Supreme Court, New York County, entered on March 28, 1980, affirmed, without costs and without disbursements.